SLIP OP. 03-168

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| NIPPON STEEL CORP., KAWASAKI STEEL CORP., THYSSENKRUPP ACCIAI SPECIALI TERNI S.p.A. AND ACCIAI SPECIALI TERNI (USA), INC., | : : : : : | |
| PLAINTIFFS, | : : | |
| v. | : : | CONSOL. COURT NO. 01-00103 PUBLIC VERSION |
| UNITED STATES, | : : | |
| DEFENDANT, | : : | |
| AND | : : | |
| ALLEGHENY LUDLUM CORP., AK STEEL CORP., BUTLER ARMCO INDEPENDENT UNION, ZANESVILLE ARMCO INDEPENDENT UNION, AND UNITED STEELWORKERS OF AMERICA, AFL-CIO/CLC, | : : : : : | |
| DEFENDANT-INTERVENORS. | : : : | |

[United States International Trade Commission's sunset review of countervailing and antidumping duty orders on grain-oriented silicon electrical steel, as modified on remand, remanded a second time.]

Dated: December 17, 2003

*Gibson, Dunn & Crutcher, LLP* (*Joseph H. Price, Douglas R. Cox, Gracia M. Berg, Gregory C. Gerdes*), for plaintiff Nippon Steel Corporation.

*Arent Fox Kintner Plotkin & Kahn, PLLC* (*Robert H. Huey, Matthew J. Clark, Nancy A. Noonan, Steven F. Hill, Timothy D. Osterhaus*), for plaintiff Kawaski Steel Corporation.

*Hogan & Hartson, LLP* (*Lewis E. Leibowitz, Steven J. Routh, David G. Leitch, T. Clark*

*Weymouth*, *David P. Kassebaum*), for plaintiffs ThyssenKrupp Acciai Speciali Terni S.p.A. and Acciai Speciali Terni (USA), Inc.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission; *James M. Lyons*, Deputy General Counsel, United States International Trade Commission (*Gracemary Rizzo Roth-Roffy*, *Mark B. Rees*), for defendant United States International Trade Commission.

*Collier Shannon Scott, PLLC* (*Kathleen W. Cannon*, *Michael J. Coursey*, *Eric R. McClafferty*, *John M. Herrmann*, *Grace W. Kim*, *David A. Hartquist*), for defendant-intervenors Allegheny Ludlum Corporation, AK Steel Corporation, Butler Armco Independent Union, Zanesville Armco Independent Union, and the United Steelworkers of America, AFL-CIO/CLC.

## OPINION AND ORDER

*EATON*, *Judge*: This case is before the court following remand to the United States International Trade Commission ("ITC"). In *Nippon Steel Corp. v. United States*, 26 CIT __, slip op. 02-153 (Dec. 24, 2002) ("*Nippon III*"),[1] this court remanded the ITC's sunset review determination in Grain-Oriented Silicon Electrical Steel From Italy and Japan, USITC Pub. 3396, Invs. Nos. 701-TA-355 and 731-TA-659–660 (Feb. 2001), List 1, Doc. 75 ("Final Determination"),[2] made pursuant to 19 U.S.C. §§ 1675(c), 1675a(a) (2000).[3] The court instructed the ITC to:

---

[1]     *See also Nippon Steel Corp. v. United States*, 25 CIT __, slip op. 01-153 (Dec. 28, 2001) (holding plaintiffs had standing to challenge the recess appointment of Commissioner Dennis M. Devaney and granting discovery); *Nippon Steel Corp. v. United States*, 26 CIT __, 239 F. Supp. 2d 1367 (2002) (holding appointment of Dennis M. Devaney as a commissioner of the ITC was valid).

[2]     The staff report accompanying the Final Determination ("Staff Report") is in the public record at List 1, Doc. 75. The confidential version is in the record at List 2, Doc. 41.

[3]     Grain-oriented silicon electrical steel ("GOES") is

a flat-rolled alloy steel product containing by weight at least 0.6 percent of silicon, not more than 0.08 percent of carbon, not more than 1.0 percent of aluminum, and no other element in an amount that would give the steel the characteristics of another alloy steel,

(continued...)

> (1) determine, in accordance with the court's finding as to the meaning of "likely" within the context of . . . [19 U.S.C. §§] 1675(c) and 1675a(a) [i.e., that likely means probable], whether revocation of the Subject Orders would be likely to lead to continuation or recurrence of material injury, upon consideration of the likely volume, price effect, and impact of imports of the subject merchandise on the industry; and (2) demonstrate, in conformity with this opinion, (a) that it performed the requisite analysis by considering each of the four factors outlined in 19 U.S.C. § 1675a(a)(2)(A)–(D); and (b) that it considered whether, were the Subject Orders revoked, the likely volume of imports of the subject merchandise would be significant either in absolute terms or relative to production or consumption in the United States, pursuant to 19 U.S.C. § 1675a(a)(2).

*Nippon III*, 26 CIT at __, slip op. 02-153 at 16.  In light of its findings with respect to the ITC's application of the likely standard and the legal sufficiency of the ITC's analysis of likely volume, pursuant to 19 U.S.C. § 1675a(a)(2), the court did not address the parties' substantial evidence arguments, finding that to do so at that time would have been premature.  *Id*. at 15.

In its remand determination, the ITC stated that it applied "likely" to mean "probable."

---

[3](...continued)
> of a thickness of no more than 0.56 millimeters, in coils of any width, or in straight lengths which are of a width measuring at least 10 times the thickness . . . [of the steel].

Grain-Oriented Elect. Steel From Italy and Japan, 65 Fed. Reg. 41,433, 41,433 (Dep't Commerce July 5, 2000) (final results of expedited sunset reviews of antidumping duty orders).  "GOES is used to manufacture laminated cores for electrical transformers and other electrical devices."  Staff Report at I-10.  "Demand for GOES is derived from the demand for transformers, which, in turn, is derived from the demand for electricity."  *Id*. at II-1.  The countervailing and antidumping duty orders in these sunset reviews ("Subject Orders") were issued in 1994 and published in the Federal Register at 59 Fed. Reg. 29,414 (Dep't Commerce June 7, 1994) (countervailing duty order on GOES from Italy), 59 Fed. Reg. 29,984 (Dep't Commerce June 10, 1994) (antidumping duty order on GOES from Japan), 59 Fed. Reg. 41,431 (Dep't Commerce Aug. 12, 1994) (antidumping duty order on GOES from Italy).

*See* Grain-Oriented Silicon Electrical Steel From Italy and Japan, USITC Pub. 3585, Invs. Nos.

701-TA-355 and 731-TA-659–660 (Mar. 2003), List 1, Doc. 79R ("Remand Determination")[4] at

2 n.6 ("For purposes of the Commission's determinations on remand in these reviews, we apply

the term 'likely' consistent with the Court's instruction and with other recent decisions of the

Court of International Trade which address the meaning of the term 'likely' as it is to be applied

in five-year reviews.") (citing *Usinor Industeel, S.A. v. United States*, 26 CIT __, __, slip op. 02-

39 at 25 (Apr. 29, 2002); *Usinor v. United States*, 26 CIT __, __, slip op. 02-70 at 43–44 (July

19, 2002); *Usinor Industeel, S.A. v. United States*, 26 CIT __, slip op. 02-75 (July 30, 2002);

*Usinor Industeel, S.A. v. United States*, 26 CIT __, slip op. 02-152 (Dec. 20, 2002)).  With

respect to its likely volume analysis, the ITC stated that it considered each of the statutory factors

in 19 U.S.C. § 1675a(a)(2)(A)–(D), and found that "[b]ecause of the nature of the GOES industry

and market, . . . all four factors were [not] dispositive in [its] analysis."[5]  *Id*. at 3.  The ITC

concluded that "the likely volume of subject imports would be significant in terms of U.S.

production and U.S. apparent consumption if the countervailing and antidumping duty orders

were revoked."  *Id*. at 10–11.  In addition, the ITC adopted the views expressed in the Final

Determination with respect to the domestic like product, domestic industry, conditions of

---

[4]        For the confidential Remand Determination, see Grain-Oriented Silicon Electrical Steel From Italy and Japan, USITC Pub. 3585, Invs. Nos. 701-TA-355 and 731-TA-659–660 (Mar. 2003), List 2, Doc. 142R ("Conf. Remand Determination").

[5]        In particular, the ITC found that the "lack of inventories, absence of barriers to importation in other markets, and limited potential for product shifting, did not outweigh other factors which led [the Commissioners] to conclude that the likely volume of imports would be significant if the orders were revoked."  Remand Determination at 3.

competition, and cumulation determinations.[6]  *Id*. at 2.  By its Remand Determination, the ITC

affirmed its original conclusion that revocation of the Subject Orders would be likely to lead to

continuation or recurrence of material injury to an industry in the United States within a

reasonably foreseeable time.  *Id*. at 17.


Plaintiffs Nippon Steel Corporation ("Nippon"), Kawasaki Steel Corporation

("Kawasaki")[7] (collectively, the "Japanese producers"), and ThyssenKrupp Acciai Speciali Terni

S.p.A.[8] ("AST" or the "Italian producer") and Acciai Speciali Terni (USA), Inc.[9] (collectively,

"Plaintiffs") challenge, as unsupported by substantial evidence on the record, several of the ITC's

determinations, including those relating to cumulation, likely volume, likely price effects, and

likely impact on the domestic industry.[10]  The court has jurisdiction pursuant to 28 U.S.C. §

---

[6]     While plaintiffs in this action argue that the ITC, in relying on its prior views as expressed in the Final Determination, failed to comply with the court's directive in *Nippon III* to apply "likely" to mean "probable," the court notes that they are actually challenging whether the ITC's findings, using the standard that likely means probable, are supported by substantial evidence.

[7]     Kawasaki is now known as JFE Steel Corporation.  *See* Letter to Clerk of the Court from Arent Fox Kintner Plotkin & Kahn, PLLC of 4/23/03.

[8]     Effective January 18, 2002, Acciai Speciali Terni S.p.A. changed its name to ThyssenKrupp Acciai Speciali Terni S.p.A.  *See* Notice filed by Hogan & Hartson, LLP of 2/11/02.

[9]     Acciai Speciali Terni (USA), Inc. [[
        ]]  Staff Report at IV-4.

[10]     *See* Plaintiffs' Comments on the Remand Determination of the U.S. International Trade Commission ("Pls.' Comments").  Defendant-intervenors Allegheny Ludlum Corp., AK Steel Corp., Butler Armco Independent Union, Zanesville Armco Independent Union, and United Steelworkers of America, AFL-CIO/CLC submitted Defendant-Intervenors' Comments

(continued...)

1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I). For the reasons set forth below, the court remands this matter to the ITC for further action in conformity with this opinion.

## STANDARD OF REVIEW

The court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted). In conducting its review, the court's function is not to reweigh the evidence but rather to ascertain whether the ITC's determinations are supported by substantial evidence on the record. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). The possibility of drawing two inconsistent conclusions from the record evidence does not, in itself, prevent the ITC's determinations from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

## DISCUSSION

### I. CUMULATION

In a sunset review, before making its "likelihood of continuation or recurrence of material injury" determination, the ITC may, in its discretion, cumulatively assess the volume and effect

---

[10](...continued)
Addressing Remand Determination of U.S. International Trade Commission, and the ITC submitted Defendant's Comments on Plaintiffs' Objections to the International Trade Commission's March 14, 2003 Remand Determination ("Def.'s Comments").

of imports of subject merchandise from different countries[11] "if such imports would be likely to compete with each other and with domestic like products in the United States market." 19 U.S.C. §1675a(a)(7)[12]; *see also Usinor Industeel, S.A.*, 26 CIT at __, slip op. 02-152 at 11 (quoting 19 U.S.C. § 1675a(a)(7)). Cumulation is prohibited where the ITC "determines that such imports are likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. §1675a(a)(7). That is, "[t]he Commission shall not cumulate imports *from any country* if those imports are likely to have no discernible adverse impact on the domestic industry." Statement of Administrative Action, accompanying H.R. REP. NO. 103-826(I), at 887, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4212 ("SAA")[13] (emphasis added); *see also Usinor Industeel, S.A.*, 26 CIT at __, slip op. 02-152 at 12 (noting "there is no statutory provision enumerating the factors to be considered in determining whether subject imports from a particular country are likely to have no discernible impact.").

---

[11]      The aim of the cumulation provision is to address the "hammering effect" that "'competition from unfairly traded imports from several countries simultaneously often has . . . on the domestic industry.'" *Neenah Foundry Co. v. United States*, 25 CIT __, __, 155 F. Supp. 2d 766, 772 (2001) (quoting H.R. REP. NO. 100-40, part 1, 100th Cong., 1st Sess., at 130 (1987)). The cumulation provision enables the ITC to conduct a "more realistic" material injury analysis, "in terms of recognizing the actual effects of unfair import competition." H.R. REP. NO. 100-40, part 1, 100th Cong., 1st Sess., at 130 (1987).

[12]      The statute also requires that the antidumping or countervailing duty sunset reviews be initiated on the same day. *See* 19 U.S.C. § 1675a(a)(7). It is undisputed that this requirement has been met.

[13]      The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

In the Final Determination,[14] the ITC stated, (1) "that subject imports from each country would enter the U.S. market in sufficient quantities and at sufficiently low prices such that they would have a discernible adverse impact on the domestic industry," Final Determination at 9; (2) that "there likely would be a reasonable overlap of competition . . . between the subject imports themselves, if the orders are revoked," *id*. at 10, and (3) that "there likely would be a reasonable overlap of competition between the subject imports [from Japan and Italy] and the domestic like product, . . . if the orders are revoked," *id*., and therefore exercised its discretion to cumulate the subject imports. Plaintiffs dispute the first and second of these findings.

## A.    *No Discernible Adverse Impact*

In determining whether imports are likely to have no discernible adverse impact on the domestic industry, the ITC, as this Court has explained, engages in a dual inquiry:

> [A]n affirmative finding of discernible impact is only part of the answer to the question of whether cumulation is precluded. In other words, the first question is whether the imports [from a particular country] are likely to have any [discernible] impact. If not, the ITC is precluded from cumulating. If yes, then the question remains whether that impact is also adverse.

*Neenah Foundry Co.*, 25 CIT at __, 155 F. Supp. 2d at 775; *Chefline Corp. v. United States*, 25 CIT __, __, 170 F. Supp. 2d 1320, 1331 (2001) (quoting *Neenah Foundry*, 25 CIT at __, 155 F. Supp. 2d at 775). The likely "discernible impact" determination is not limited to an analysis of

_____

[14]    On remand, the ITC found that "the application of the term 'likely' as meaning 'probable' [did] not change [its] reasoning or conclusions . . . [contained in its] prior views" with respect to the issues of no discernible adverse impact and reasonable overlap of competition. Remand Determination at 2. Thus, as to those issues, the court focuses on the ITC's findings in the Final Determination.

volume, as evidenced by Congress's use of the word "impact" in the statute, which, "in the context of U.S. unfair trade law, by any definition, encompasses more than volume of imports." *Neenah Foundry Co.*, 25 CIT at __, 155 F. Supp. 2d at 776. That the discernible impact also must be adverse requires that the imports cause some harm. For cumulation to be warranted, however, this harm need not rise to the level of "material injury."[15]

The ITC stated its discernible adverse impact determination as follows:

> Because of the conditions of competition and the current condition of the domestic industry,[16] exports from Italy and Japan[17] likely

---

[15]    As the court recently stated in *Usinor Industeel, S.A. v. United States*, 27 CIT __, slip op. 03-118 (Sept. 8, 2003):

> An adverse impact, or harm, can be discernible but not rise to a level sufficient to cause material injury. The different standards reflect the nature of the cumulation analysis. Certain imports are to be cumulated to assess causation of material injury, but the no "discernible impact" provision provides a safe harbor of sorts for certain imports viewed in isolation.

*Id*. at 7 (footnote omitted) (citing *Neenah Foundry Co.*, 26 CIT at __, 155 F. Supp. 2d at 772–73).

[16]    The ITC found the following with respect to the conditions of competition and condition of the domestic industry: (1) increasing demand for electricity in the United States, (2) decreasing excess electrical capacity worldwide, (3) increased use of lower, less efficient and less costly grades of GOES due to uncertainties resulting from the deregulation of the electrical power industry, (4) increasing competition between U.S. transformer producers and laminators/stampers and transformer imports from Canada and Mexico (many of which are made with Japanese and Italian GOES), (5) the need of manufacturers to maintain high capacity utilization rates to remain profitable due to the capital-intensive nature of GOES production, and (6) apparent improvement in the state of the domestic industry since the imposition of the Subject Orders. *See* Final Determination at 14–16.

[17]    Apparently because its findings for Japan and Italy were similar with respect to

(continued...)

would have a discernible adverse impact on the domestic industry.

Subject imports from Italy and Japan have remained in the U.S. market in the years since the orders were imposed, albeit at substantially reduced levels. The continuing presence of these subject imports in the domestic market indicates that subject foreign producers continue to have contacts and channels of distribution necessary to compete in the U.S. market.

Industry capacity in Japan has remained large (greater than annual U.S. consumption) and industry capacity in Italy has grown since the original investigations. The GOES industries in both Italy and Japan devote considerable resources to export markets. In 1999, the share of total shipments of GOES exported from Italy was [[      ]] percent while the share of total shipments of GOES exported from Japan was [[      ]] percent. For the reasons discussed below,[18] we believe that subject imports from each country would enter the U.S. market *in sufficient quantities and at sufficiently low prices* such that they would have a discernible adverse impact on the domestic industry.

---

[17](...continued)
discernible adverse impact, the ITC has chosen to express its findings for each country concurrently. It is important to note, however, that the statute and the SAA require that a discernible adverse impact finding be made for each country individually, and that, in fact, the ITC stated its conclusion in conformance with these strictures, i.e., "that subject imports from each country would enter the U.S. market in sufficient quantities and at sufficiently low prices such that they would have a discernible adverse impact on the domestic industry." Final Determination at 9; *see* SAA at 887 ("The Commission shall not cumulate imports *from any country* if those imports are likely to have no discernible adverse impact on the domestic industry." (emphasis added)).

[18]     The court examines the ITC's reasoning as it is expressed in the section entitled "Likelihood of No Discernible Adverse Impact." *See* Final Determination at 9. As noted *supra*, the ITC specifically referenced the conditions of competition in, and current state of, the domestic industry "[b]ecause of" which the ITC concluded that Japanese and Italian imports likely would have a discernible adverse impact. That much is clear. By citing the "reasons discussed below," *id*., it is possible that the ITC meant that it generally took into consideration its subsequent determinations with respect to reasonable overlap of competition, likely volume, price effects, and impact. Because of the importance of these findings, however, on remand the ITC shall state with specificity which of these matters it took into consideration including specific citation to any documents taken into consideration, and explain clearly its reasons for relying on such document and its analysis in arriving at its findings.

Final Determination at 9 (footnotes omitted) (emphasis added).  Plaintiffs take issue with the

ITC's findings as to the Japanese and Italian imports' "continuing presence" in the U.S. market,

the size of GOES industry capacity in Japan and Italy, and the Japanese and Italian GOES

industries' export orientation.  They argue that "[none] of these findings . . . is sufficient to show

that GOES imports from Italy and Japan *likely* would have any discernible impact – let alone a

discernible *adverse* impact – upon the domestic industry."  Pls.' Mem. Supp. Mot. J. Agency R.

("Pls.' Mem.") at 15 (emphasis in original).


        First, Plaintiffs argue that "record evidence does not, in fact, show that the subject

producers have had such a 'continuing presence' [in the U.S. market] that they 'continue to have

contacts and channels of distribution necessary to compete in the U.S. market.'"  Pls.' Mem. at

15 (quoting Final Determination at 9).  With respect to Japan, Plaintiffs argue that the record

shows that Nippon and Kawasaki exported little or no GOES to the United States between 1997

and 2000 (the "Review Period").[19]  *Id*.  With respect to Italy, Plaintiffs contend that the record

shows that "Italian producer AST had very few sales in the U.S. over the period of

investigation," i.e., "less than 85 tons of Italian imports over a 45-month period, with no sales

during the first nine months of 2000."  *Id*. (citing Staff Report, tbl. I-4).  Second, Plaintiffs argue

---

        [19]        Specifically, Plaintiffs argue, [[

                ]] Pls.' Mem. at 15 (emphasis in original) (citing [[          ]] Foreign
Producer Questionnaire Resp., List 2, Doc. 59 at 8).  Furthermore, [[      ]] "exported only [[
        ]] of high-permeability GOES over the forty-five months reviewed by the Commission,
and made the vast majority of those sales [[              ]] during the [[
        ]]," and most recent data show that [[
                                                ]] *Id*. at 15–16 (citing [[          ]]
Foreign Producer Questionnaire Resp., List 2, Doc. 60 at 8).

that the ITC's findings that Japanese GOES industry capacity is "large" and that Italian GOES

industry capacity "has grown," without more, do not support the finding that Japanese and Italian

subject imports would likely cause a discernible adverse impact. *Id*. at 16. According to

Plaintiffs, the evidence shows that the Japanese and Italian producers "are operating at or near

full capacity and will be for the foreseeable future . . . ." *Id*. at 17. Third, Plaintiffs contend that

the ITC's finding that the Japanese and Italian GOES industries are export-oriented "is not

predictive of what the size, make-up or impact of their U.S. exports *likely* would be if the orders

were revoked." *Id*. (emphasis in original).


The ITC responds to each of these arguments in turn. First, the ITC contends that, with

respect to "continuing presence," "[i]t is not the amount of sales but the continuation of sales that

is of relevance." Def.'s Mem. Opp'n Pls.' Mot. Summ. J. Agency R. ("Def.'s Mem.") at 18. The

ITC explains:

> The continued sales indicate subject producers did not altogether
> abandon the U.S. market but continued to maintain ties with U.S.
> customers after the orders were imposed. As such, subject
> producers had maintained the commercial links which would allow
> them to increase imports to the U.S. market with relative ease if the
> orders were lifted.

*Id*. at 18–19. Second, the ITC contends that the size of GOES industry capacity in Japan and

Italy must be viewed against the backdrop of the prevailing conditions of competition in the

industry. The ITC highlights that "GOES steel production is relatively capital intensive" and

requires manufacturers to "sustain relatively high capacity utilization rates to stay profitable." *Id*.

at 19. Therefore, the ITC posits, "increases of the volume of subject imports from each country

would be likely." *Id*. Third, the ITC argues that the Japanese and Italian GOES industries'

export orientation must also be evaluated in the context of the conditions of competition. The

ITC claims that where an industry such as the GOES industry is reliant on exports to maintain its

capacity utilization rates, there exists "economic incentive for subject producers to increase

levels of subject imports to the higher-priced U.S. market[20] upon revocation." *Id*. at 19–20. The

ITC argues that its finding "that subject imports from Japan and Italy would likely increase and

be sold at price depressing levels resulting in a discernible adverse impact . . . are both

reasonable and supported by substantial evidence." *Id*. at 21.

The court does not agree that substantial evidence supports the ITC's finding that GOES

imports from Japan and GOES imports from Italy would likely have a discernible adverse impact

on the domestic industry upon revocation of the Subject Orders. The court shall examine the

record evidence with respect to Japan and Italy separately, to determine whether it supports the

ITC's determinations—i.e., whether "a reasonable mind might accept [the evidence] as adequate

to support [the ITC's] conclusion[s]."[21] *Consol. Edison Co.*, 305 U.S. at 229. In conducting its

review, however, the court "cannot evaluate the substantiality of evidence supporting an ITC

determination 'merely on the basis of evidence which in and of itself justified it, without taking

---

[20]     As discussed *infra* with respect to likely volume, the ITC found that GOES commands a higher price in the U.S. market than in other markets, and that such higher prices provided an "incentive" for GOES imports from Japan and Italy to be directed to the U.S. market upon revocation of the Subject Orders. Remand Determination at 5.

[21]     Plaintiffs do not challenge the ITC's findings with respect to conditions of competition and the condition of the domestic industry. Thus, the court limits its analysis to the findings in dispute.

into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Rather, to determine the substantiality of the evidence, the court must also take into account "whatever in the record fairly detracts from its weight." *Universal Camera*, 340 U.S. at 488; *Suramerica*, 44 F.3d at 985 (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

     With respect to the Japanese GOES imports' "continuing presence" in the U.S. market, the evidence reveals that Japanese GOES was, in fact, sold in the United States during the Review Period, "albeit at substantially reduced levels."  Final Determination at 9.  Indeed, the evidence cited by Plaintiffs shows the reduced levels of Japanese imports after imposition of the Subject Orders.  *See supra* n.19.  This evidence supports the ITC's finding that Japanese producers have maintained commercial contacts with U.S. customers such that the subject imports have a "continuing presence" in the U.S. market.  Second, with respect to the size of GOES industry capacity in Japan, the record reasonably supports the finding that industry capacity was "large," compared to annual U.S. consumption, during the Review Period. *Compare* Staff Report, tbl. I-1 (annual U.S. consumption figures) *with* tbl. IV-6 (annual Japanese production capacity).  Third, the record supports the ITC's finding that the Japanese producers are export-oriented.  S*ee id.* at II-22 ("The two Japanese producers' exports of GOES to third-country markets, as a share of . . . their total GOES shipments, averaged [[          ]] by quantity during [the Review] [P]eriod . . . .").

There is, however, evidence that fairly detracts from the ITC's finding that the Japanese GOES imports would likely have a discernible adverse impact on the domestic industry, and this evidence must be accounted for on remand. First, the most recent data with respect to capacity utilization suggests that, because the Japanese producers are operating at high capacity utilization rates, increases in volume are not at all likely. Staff Report at II-21 (stating "the currently high level of capacity utilization suggests *no ability* of the Japanese producers to increase GOES exports to the United States in response to an increase in demand." (emphasis added)); *see also Usinor*, slip op. 02-70 at 24–25 (finding, *inter alia*, ITC's failure to address most recent capacity utilization data rendered decision to cumulate German imports unsupported by substantial evidence).[22] Second, according to the Staff Report, [[

]], i.e., their European, Asian, Mexican and Canadian customers, reduce the likelihood that these producers would be able to significantly increase their imports to the United States in a reasonably foreseeable time.[23] Staff Report at II-22. Specifically, the ITC staff concluded that the existence of such contracts

---

[22]     Capacity utilization rates declined for the Japanese producers from [[     ]] percent in 1997 to [[      ]] percent in 1998 but rose to [[      ]] percent in 1999. Staff Report, tbl. IV-6. In the Remand Determination, the ITC noted the high capacity utilization rates in interim 2000, [[          ]], but concluded that these rates would "likely fluctuate for the foreseeable future." Conf. Remand Determination at 11 n.56. The ITC thus found that "appreciable unused capacity" existed for the Japanese producers. *Id*. at 9. The court cannot sustain this finding. The ITC seems to have concluded that merely because utilization rates have fluctuated in the past, they are likely to do so in the future, and that they will fluctuate to an extent that would allow levels of exports to the United States the impact of which would be both discernible and adverse. Without more, this does not satisfy the likely standard.

[23]     For example, one such contract was entered between [[

]] Staff Report at II-22–23.

indicated that exports "may not be readily available in the short run to increase GOES shipments to the United States in response to an increase in GOES demand." *Id*. at II-23. Third, the ability to expand capacity was found to be limited, and the ITC itself concluded on remand that "subject producers indicate[d] that they have no plans to increase capacity within the foreseeable future." Remand Determination at 9.

With respect to Italy, the record supports the ITC's finding that the Italian imports have maintained a continuing, although minimal, presence in the U.S. market. Staff Report at II-19 (indicating that exports of GOES from Italy to the United States during the Review Period accounted for [[        ]] by quantity of total Italian shipments). The record also supports the ITC's finding that industry capacity in Italy has grown since the original investigation. *Id.*, tbl. IV-2. Further, the court agrees that the record substantially supports the finding that AST is export-oriented. The evidence indicates that during the Review Period, "[e]xports of GOES to third-country markets as a share of total shipment quantities averaged [[        ]] . . . ." *Id.* at II-19–II-20 & tbl. IV-2. The share of the total quantity of shipments shipped in the home market during the Review Period was [[            ]]. *See id.*, tbl. IV-2.

Other record evidence, however, fairly detracts from the ITC's finding that Italian GOES would likely have a discernible adverse impact on the domestic industry. First, AST's capacity utilization rate during the most recent period remained high, and according to the Staff Report, this "suggests that there is *little ability* of AST to increase exports to the United States in

response to an increase in demand."[24]  Staff Report at II-19 (emphasis added).  Second, evidence

on the record suggests that the Italian producer would not likely increase its GOES production

capacity due to the high costs and length of time required to do so.  *Id*.  Indeed, as with Japan, the

ITC found on remand that the Italian producer "indicate[d] that [it has] no plans to increase

capacity within the foreseeable future . . . ."  Remand Determination at 9.


        While substantial evidence is "something less than the weight of the evidence," the court

is not convinced that the ITC has sufficiently supported its discernible adverse impact findings

and thus must remand the matter.  *Consolo*, 383 U.S. at 620; *Nippon Steel Corp. v. United States

Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).  The court is mindful that "the

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence"; however, the ITC

must explain its findings and support them with substantial evidence in the first instance.

*Consolo*, 383 U.S. at 620.  Here, the evidence must support a conclusion of "likely" consistent

with the court's earlier ruling on this issue, i.e., that likely means probable.  In light of the

evidence of record that detracts from the ITC's findings with respect to the likely discernible

adverse impact of Japanese GOES imports and the likely discernible adverse impact of Italian

---

        [24]      While AST's capacity utilization rates were high throughout the Review Period,
capacity utilization rates declined from [[       ]] percent in 1997 to [[       ]] percent in 1999.
Staff Report, tbl. IV-2.  Noting AST's high capacity utilization rates in interim 2000—[[       ]]
percent—the ITC nonetheless concluded that the rates had fluctuated during the 1997 to 1999
period, they would "likely fluctuate for the foreseeable future," and thus found that appreciable
unused capacity existed for the Italian producer.  Conf. Remand Determination at 11 n.56.  As
noted *supra* note 22, this is insufficient to support a finding of likely future fluctuation of
capacity utilization levels.

GOES imports, the court cannot find that substantial evidence supports these determinations. *Universal Camera*, 340 U.S. at 488; *Suramerica*, 44 F.3d at 985. Accordingly, the court remands this matter for further consideration by the ITC.

On remand, the ITC shall clearly address the following evidence and explain its effect on the ITC's discernible adverse impact determination: (1) with respect to Japan: (a) interim 2000 capacity utilization data, indicating that it is unlikely that the Japanese producers will increase exports to the United States, *see supra* n.22, (b) [[

]], and (c) the evidence with respect to the Japanese producers' inability to increase production capacity; and (2) with respect to Italy: interim 2000 capacity utilization data, indicating that it is unlikely that the Italian producer will increase exports to the United States, *see supra* n.24, and the evidence with respect to AST's inability to increase production capacity. In addition, as discussed *supra* in footnote 18, the ITC shall state with specificity which of its findings with respect to likely volume, price effects, and impact it took into consideration in arriving at its discernible adverse impact determination, including specific citation to any documents taken into consideration, and explain clearly its reasons for relying on such document and its analysis in arriving at its findings.

**B.** ***Likely Reasonable Overlap of Competition Between Imports from Japan and Imports from Italy***

Cumulative assessment of imports, pursuant to 19 U.S.C. § 1675a(a)(7), involves not only a determination of whether GOES imports from Japan and GOES imports from Italy would

each likely have a discernible adverse impact on the domestic industry, but also an examination of whether "such imports would be likely to compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1675a(a)(7).

The question the ITC is required to ask, when deciding whether to cumulate imports from different countries in the context of a sunset review, is whether a reasonable overlap in competition between the subject imports, and between subject imports and the domestic like product, likely would exist if the orders under review were revoked. *See Wieland Werke, AG v. United States*, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989); *Indorama Chems. (Thail.) v. United States Int'l Trade Comm'n*, 26 CIT __, __, slip op. 02-105 at 17 (Sept. 4, 2002). In making this determination, the ITC has generally considered (1) the degree of fungibility between imports from different countries and between those imports and the domestic like product, (2) the presence of sales or offers to sell imports from different countries and the domestic like product in the same geographical markets, (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product, and (4) simultaneous presence in the market. *See* Final Determination at 8 n.34 (citing *Wieland Werke*, 13 CIT at 563, 718 F. Supp. at 52). "These factors are neither exclusive nor determinative." *Indorama Chems. (Thail.)*, 26 CIT at __, slip op. 02-105 at 17. As the decision to cumulatively assess the volume and effect of imports from different countries is made prospectively, in the context of a sunset review determination, the ITC also considers "other significant conditions of competition that are likely to prevail if the orders under review are revoked." Final Determination at 8; *see also Usinor Industeel, S.A.*, 26 CIT at __, slip op. 02-152 at 11.

Here, Plaintiffs challenge the ITC's finding that "there likely would be a reasonable overlap of competition . . . between the subject imports [from Japan and Italy] . . . if the orders are revoked." Final Determination at 10. In its review, the ITC examined the four factors set forth in *Wieland Werke*. First, the ITC considered the degree of fungibility between imports from Japan and imports from Italy. The ITC recalled its findings in the original investigation leading to its conclusion that a reasonable overlap of competition between imports did not exist. The ITC originally found that "all imported Italian GOES was conventional, and all but a very small percentage was M-6 grade. By contrast, . . . most Japanese GOES was high-permeability steel, with some conventional, primarily M-3 grade, GOES." *Id*. at 9. This finding was important to the ITC's finding of a lack of competition between the imports in its original investigation "because purchasers often substituted only one grade up or one grade down, and . . . very few purchasers bought both the Italian and Japanese product." *Id*. Second, with respect to channels of distribution, the ITC noted that it had originally found that "Japanese GOES was sold directly to transformer manufacturers, whereas Italian GOES was sold to stampers who laminated the product and then sold it to makers of small transformers or appliances." *Id*.

Noting that the "differences in product type and channels of distribution between recent subject imports have not changed since the original determination," for purposes of the sunset review,[25] the ITC nonetheless "[did] not find them significant enough to prevent [it] from

---

[25]     In this sunset review, the ITC noted with respect to product type that, in fact, "subject imports from Italy have consisted exclusively of conventional GOES (M-6 grade), while subject imports from Japan have consisted nearly entirely of high permeability grades of GOES." Final Determination at 9. As for common or similar channels of distribution, the ITC noted that

(continued...)

concluding that there [was] likely to be a reasonable overlap of competition" between Japanese

and Italian imports of GOES.  Final Determination at 9–10.  The ITC explained:

> In a five-year review, the proper focus is on the likely post-
> revocation behavior, and the composition of current imports,
> affected by the discipline of an antidumping or countervailing duty
> order, is not necessarily indicative of likely post-revocation
> competition.  While current imports may be specialized or limited
> to a particular grade, subject producers in both Italy and Japan *can
> and do produce a broad range of GOES products*.  Over [[     ]]
> of its shipments to both Canada and Mexico were of conventional
> GOES in 2000.  For example, while Japan sells primarily high
> permeability GOES to the U.S. market, it also sells significant
> amounts of conventional GOES grades to other markets.
> Similarly, while Japanese producers currently sell directly
> primarily to end-users in the United States, *this pattern of sales is
> likely to change with an alteration in the product mix shipped to
> the United States*.  Indeed, Japanese subject producers sell to
> laminators/slitters for subsequent sale of the GOES in Mexico and
> presumably could do so in the United States.

*Id*. at 10 (emphasis added) (citations omitted).  Thus, the ITC reversed its position from the

original investigation, and concluded that a likely overlap of competition would exist between

imports from Japan and Italy if the Subject Orders were revoked.[26]

---

[25](...continued)
"subject imports from Italy are largely sold to slitters/stampers before being sold to end-users,
while the Japanese products are sold directly to a few customers." *Id*. at 9–10.

[26]      With respect to simultaneous presence and sales or offers to sell in the same
geographic market, the ITC noted that these factors were "less easy to evaluate, given that, since
the orders were imposed, U.S. imports of the subject product from both Italy and Japan have
declined substantially." Final Determination at 10.  Relying on its finding in the original
investigation that imports from Japan and Italy were simultaneously present and "generally
competed directly with the domestic product nationwide," the ITC concluded that these factors
weighed in favor of a finding that there was likely to be a reasonable overlap of competition
between imports. *Id*.

### 1.      *Fungibility*

Plaintiffs argue that it is unlikely that the Japanese and Italian producers will sell similar products in the U.S. market.  Specifically, Plaintiffs argue that the Japanese producers do not make the type of conventional GOES used in the United States—a thin gauge GOES for use in wound core transformers—and that the record indicates that the Japanese producers do not intend to start exporting conventional GOES to the United States.  Pls.' Mem. at 11–12.  Rather, Plaintiffs contend that the Japanese producers "only sought to have the subject orders removed so as to better serve their existing customers for *high-end, high-permeability GOES*."  *Id*. at 12 (emphasis in original) (citing ITC Hearing Tr. (Jan. 11, 2001) ("Tr."), List 1, Doc. 56 at 159 (testimony of Mr. Mitsuru Tsukakoshi)).

In addition, Plaintiffs contend that "the record provides no basis to believe that [AST] would change its U.S. product mix."  Pls.' Mem. at 10.  Plaintiffs contend that at all times, GOES imported from Italy was conventional, and while AST is capable of producing high permeability GOES, the record suggests that it would not export high permeability GOES to the United States.  *Id*. at 10–11 (citing, *inter alia*, AST's Posthearing Br., List 1, Doc. 60, List 2, Doc. 29 at A-1 ("AST has not shipped high-permeability GOES to Mexico or Canada, even though it had the ability to do so. . . .  AST has not sold high-permeability GOES outside of Europe.").  Plaintiffs assert that merely because "AST theoretically may be capable of changing its product mix and competing against Nippon Steel and Kawasaki for high-permeability sales in the United States (or vice-versa), [this,] without more, is an insufficient basis upon which to deem such competition likely."  *Id*. at 14 (citing *Chefline Corp.*, 26 CIT at __, 170 F. Supp. 2d at

1333). In sum, Plaintiffs argue that, the fact that both Japanese and Italian GOES producers "can and do produce a broad range of GOES products," Final Determination at 10, "says very little . . . about what these producers either *intend* to do or actually *could* do with respect to sales in the U.S. market if the orders were lifted." Pls.' Mem. at 10 (emphasis in original).

The ITC contends that its fungibility finding is supported by substantial evidence, arguing that "subject producers would likely produce similar types of GOES for sale in the U.S. market," Def.'s Mem. at 23, and that the conditions of competition make it likely that "Italian and Japanese producers will . . . ship both high-permeability and conventional GOES to satisfy U.S. demand." *Id.* at 24. The ITC further argues that competition between conventional and high permeability GOES will grow. According to the ITC, GOES purchasers will increase their "use of lower, less efficient, and less costly grades of GOES in transformer manufacture" as a result of the deregulation of the electric utilities in the United States. Final Determination at 14. In addition, "[r]elative decreases in prices of higher-grade GOES would likely result in a purchaser switching to a better grade in order to produce a low-efficiency transformer, as core performance could be significantly enhanced, thus heightening competition between high-permeability and conventional GOES." Def.'s Mem. at 24.

In evaluating the substantiality of the record evidence, the court looks at the record as a whole, taking into account any evidence that fairly detracts from its weight. *Universal Camera*, 340 U.S. at 488; *Suramerica*, 44 F.3d at 985 (citing *Atl. Sugar, Ltd.*, 744 F.2d at 1562). The court recognizes, as this Court and the Court of Appeals for the Federal Circuit have recognized,

the unique circumstances present in a sunset review that bear on the type of evidence produced at

the administrative level:

> In no case will the Commission ever be able to rely on concrete
> evidence establishing that, in the future, certain events will occur
> upon revocation of an antidumping order. Rather, the Commission
> must assess, based on currently available evidence and on logical
> assumptions and extrapolations flowing from that evidence, the
> likely effect of revocation of the antidumping order on the behavior
> of the importers.

*Ugine-Savoie Imphy v. United States*, 26 CIT __, __, 248 F. Supp. 2d 1208, 1222 (2002) (quoting

*Matsushita*, 750 F.2d at 933). The court nonetheless finds that it cannot sustain the ITC's

fungibility finding.


While it is undisputed that the Japanese and Italian subject producers "can and do

produce a broad range of GOES products," Final Determination at 10, it is not clear that the

Japanese and Italian producers would sell the same or similar product to the United States.

Specifically, the following evidence detracts from such a finding. First, according to

questionnaire responses submitted by the Japanese producers with respect to demand factors, the

type of conventional GOES they export to third country markets is a thicker gauge than the

GOES favored by U.S. purchasers, and "not compatible with the [conventional GOES] used in

the United States." Pls.' Mem. at 11; Japanese Producers' Prehearing Br., List 1, Doc. 50, List 2,

Doc. 14 at 32; [[            ]] Foreign Producer Questionnaire Resp., List 2, Doc. 59 at 44

(indicating [[

]]).  Second, the testimony of Mr. Mitsuru Tsukakoshi, a Nippon representative, further indicates that the Japanese producers do not intend to start exporting conventional GOES to the United States.[27]

Moreover, with respect to pre- and post-revocation behavior,[28] the ITC found the following.  With respect to Japan, it is clear that prior to the imposition of the Subject Orders, the Japanese producers exported high permeability GOES and "some conventional, primarily M-3 grade, GOES."  *Id*. at 9.  It is also clear that after the imposition of the Subject Orders, the Japanese producers exported almost exclusively high permeability GOES to the United States.

---

[27]      Mr. Tsukakoshi stated:

> Nippon Steel has very limited export objectives with respect to the U.S. GOES market.  Our interest in this market has been and will continue to be to sell small quantities of high-permeability products, particularly domain refined, that are not available from the U.S. industry. . . . [T]he focus of Nippon Steel's exports has been on other markets, particularly in Asia, where there is a greater demand for our products and where we had strong relationships.  We see nothing in the future that will change that focus. . . . Nippon Steel is currently operating at full capacity.  We are turning away some customers' inquiries and extending the requested delivery times for others.  Again, we see nothing to change that situation in the future.

Tr. at 159.  The court notes that such evidence "fairly detracts" from the substantiality of the evidence that supports the ITC's finding that the volume of conventional GOES from Japan would likely increase.  *See Universal Camera*, 340 U.S. at 488.

[28]      The ITC properly considered the Japanese and Italian producers' pre- and post-revocation behavior.  *See* Final Determination at 9 (comparing levels of subject imports before and after the imposition of the Subject Orders); 19 U.S.C. § 1675a(a)(1)(A)–(B); SAA at 884 ("If the Commission finds that pre-order . . . conditions are likely to recur, it is reasonable to conclude that there is a likelihood of continuation or recurrence of injury.").

*Id*. With respect to Italy, imports consisted entirely of conventional (M-6 grade) GOES both before and after the imposition of the Subject Orders. *Id*.

While the ITC indicates that it took pre-order sales of conventional GOES into consideration, it is unclear how these past sales of "some conventional, primarily M-3 grade, GOES" favor a finding that Japanese and Italian conventional GOES would export a fungible product to the United States. Final Determination at 9. One of the conditions of competition found to exist was an increase in the "use of lower, less efficient, and less costly grades of GOES in transformer manufacture." *Id*. at 14. However, the ITC made no finding as to whether the Japanese producers would likely produce and sell M-3 grade conventional GOES, or another grade of conventional GOES, for export to the United States. Plaintiffs argue that the Japanese producers do not make the type of conventional GOES used in the United States, and that it is the Japanese producers' intention to "sell small quantities of high-permeability products, particularly domain refined, that are not available from the U.S. industry." Tr. at 159; Pls.' Mem. at 12. At no point does the ITC adequately explain how, taking into account this evidence, it is probable that the Japanese producers will export a type of conventional GOES, M-3 grade or otherwise, that would likely compete with Italian conventional GOES.[29]

---

[29]    The court also notes that in the Final Determination, the ITC stated that during the original investigation the type of GOES exported by the Japanese producers did not compete with Italian conventional GOES because "purchasers often substituted only one grade up or one grade down, and . . . very few purchasers bought both the Italian and Japanese product." Final Determination at 9. Evidence on the record suggests that this has not changed. *See* Staff Report at II-31 ("Purchasers generally indicated in their questionnaire responses that the strength of substitution among the various grades of GOES was moderate, limited, or weak. . . . It is not economical . . . to substitute down one grade (i.e., M-6 for M-5)."). Without further explanation

(continued...)

With respect to Italy, the ITC found that the Italian producer "can and [does] produce a broad range of GOES products," Final Determination at 10, but does not go any further in its analysis of whether the Italian producer would likely export high permeability GOES to the United States, except to say that "AST may seek to sell some of its high-permeability products in the United States in view of the [[                                    ]] . . . selling these products in the United States and its increased production of high-permeability GOES." *Id.* (citing AST's Posthearing Br., List 2, Doc. 29 at A-1; Petitioners' Prehearing Br., List 2, Doc. 16, Ex. 3). Without more, the ITC has merely shown that it is now possible for AST to export high permeability GOES to the United States, which, of course, is insufficient to satisfy the likely standard. *Nippon III*, 26 CIT at __, slip op. 02-153 at 16.[30]

Even considering the prospective nature of a sunset review and the difficulty with which the ITC is faced in gathering concrete evidence of likely future events, the court is not convinced, in light of the detracting evidence, that the ITC has substantially supported, and adequately explained, its determination that the Japanese and Italian producers will likely sell a fungible

---

[29](...continued)
as to what grade of conventional GOES, if any, the Japanese producers are likely to export to the United States, it is impossible to gauge whether Japanese and Italian imports would likely compete, since the evidence indicates that purchasers do not find it economically feasible to substitute all grades of conventional GOES equally.

[30]     While AST was [[            ]] to the United States prior to the Subject Orders being put in place, AST has not been constrained by [[            ]] since 1998, i.e., a time that falls within the Review Period. Staff Report at II-18. The lack of any sales of high permeability GOES in the United States, despite the ability to do so since 1998, would seem to further undermine the finding that Italian sales of high permeability GOES would be likely.

GOES product in the United States.  On remand, the ITC shall explain in detail why it is probable that the Japanese producers will export a type of conventional GOES, M-3 grade or otherwise, that would likely compete with Italian conventional GOES, taking into account the following: (a) evidence that the type of conventional GOES produced by the Japanese producers for export to third country markets is different in thickness than the GOES favored by U.S. purchasers, and (b) evidence that the Japanese producers intend to "sell small quantities of high-permeability products, particularly domain refined, that are not available from the U.S. industry." Tr. at 159.  In addition, the ITC shall explain in detail how it is probable that the Italian producer will export high permeability GOES such that it would likely compete with Japanese high permeability GOES.  The ITC shall address its evidence in the context of an explanation as to whether it is likely, not merely possible, that the subject producers will change their respective product mixes such that Japanese GOES and Italian GOES will likely compete in the U.S. market.  *Nippon III*, 26 CIT at __, slip op. 02-153 at 16.

### 2.    *Channels of Distribution*

Plaintiffs argue that the ITC's channels of distribution finding is flawed because it is based on unsupported assumptions.  Plaintiffs contend that the ITC incorrectly (1) assumed that Japanese producers "are *likely* to alter their U.S. product mix if the subject orders are revoked," in order to sell conventional GOES to the United States and (2) assumed "that the Japanese producers' distribution patterns would change, such that the Japanese and Italian producers would both sell to laminators/distributors." Pls.' Mem. at 13, 12.  Plaintiffs argue the record supports neither of these assumptions and contends that the ITC's findings are

> devoid of any analysis or record support as to *why* . . . a change in
> the Japanese producers' product mix would cause them to sell
> more GOES through laminators/slitters, or why such a change
> would increase competition with Italian imports. Rather, the ITC's
> findings rest simply on *speculation* that the Japanese producers
> would carry over their Mexican sales practices to the United States
> – a fact that the Commission itself seems to recognize.

*Id*. at 13 (emphasis in original) (citing Final Determination at 10).

The ITC argues in favor of the conclusion that the Japanese producers' pattern of sales (to end users) and thus, channels of distribution, is likely to change with an alteration in the product mix shipped to the United States. As the ITC stated in the Final Determination, "Japanese subject producers sell to laminators/slitters for subsequent sale of the GOES in Mexico and presumably could do so in the United States." Final Determination at 10. In support of this conclusion, the ITC argues that "the record shows that both Japanese and Italian subject producers sell to laminators/slitters in Mexico." Def.'s Mem. at 28. The ITC stresses that "[Plaintiffs'] sales practices (selling GOES to laminators/slitters) in Mexico hinge[] on what type of GOES is sold." *Id*. at 27–28. The ITC concludes that "[g]iven that Japanese subject producers would likely sell appreciable quantities of conventional GOES in the United States," due to, *inter alia*, the increase in U.S. demand for conventional grades of GOES, "it would be likely that Japanese subject producers would sell to end users *and* laminators/slitters in the United States as well." *Id*. at 28 (emphasis in original).

The court finds that the ITC's conclusion that Japanese and Italian producers are likely to sell in the same or similar channels of distribution is unsupported by substantial evidence. Here,

the ITC determined that the Japanese producers would "presumably" start to sell to laminators/slitters in the United States based on an anticipated change in the product mix sold by the Japanese producers in the United States, i.e., "that Japanese subject producers would likely sell appreciable quantities of conventional GOES in the United States . . . ." Def.'s Mem. at 28. However, as discussed above, the ITC has not demonstrated that such a change in product mix sold in the United States would be likely. The ITC's finding that the Japanese producers would sell conventional GOES in the United States, such that Japanese and Italian GOES would likely compete, is unsupported by substantial evidence. Therefore, the basis on which the ITC's determination with respect to channels of distribution rests is questionable. Moreover, while it may not be logistically impossible, concluding that the Japanese producers "presumably" could sell conventional GOES to laminators/slitters in the United States because it has been doing so in Mexico and Canada is not enough to satisfy the likely standard.

While the ITC has discretion in the area of cumulation, it must nonetheless support its decisions with substantial evidence. It has not done so here. On this second remand, the ITC shall, taking into account its finding on remand with respect to fungibility, revisit its finding that the Japanese and Italian producers of GOES will change their patterns of sale, such that "common or similar channels of distribution" for imports from Japan and Italy exist, and an overlap of competition between Japanese and Italian GOES imports would be likely. *Wieland Werke*, 13 CIT at 563, 718 F. Supp. at 52. The ITC shall support those explanations with substantial evidence that the Japanese and Italian producers will both likely sell to end users, or laminators/slitters.

## II.     LIKELIHOOD OF CONTINUATION OR RECURRENCE OF MATERIAL INJURY

Ultimately, the ITC is charged with the duty of determining whether revocation of an antidumping or countervailing duty order would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.  In making this determination, the ITC is instructed by statute to consider "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . ."  19 U.S.C. § 1675a(a)(1).  In reaching its determination, the ITC "shall take into account":

> (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued . . .,
>
> (B) whether any improvement in the state of the industry is related to the order . . ., [and]
>
> (C) whether the industry is vulnerable to material injury if the order is revoked . . . .

19 U.S.C. § 1675a(a)(1)(A)–(C).[31]  "The presence or absence of any factor which the Commission is required to consider . . . shall not necessarily give decisive guidance with respect to the Commission's determination of whether material injury is likely to continue or recur within a reasonably foreseeable time . . . ."  19 U.S.C. § 1675a(a)(5); SAA at 886 ("[T]he Commission must consider all factors, but no one factor is necessarily dispositive.").  The ITC determined in these sunset reviews that there was a likelihood of continuation or recurrence of material injury if the Subject Orders were revoked.  *See* Final Determination at 20; Remand

---

[31]     Title 19 U.S.C. § 1675a(a)(1)(D), relating to duty absorption, was not relevant in these investigations, as "Commerce [did] not issue[] any duty absorption determinations in the instant reviews."  *See* Final Determination at 12 n.59.

Determination at 17. Plaintiffs challenge the ITC's likely volume, price effect, and impact

determinations as unsupported by substantial evidence.

### A.     *Likely Volume*

Title 19 U.S.C. § 1675a(a)(2) governs the ITC's determination of likely volume. It states:

> In evaluating the likely volume of imports of the subject
> merchandise if the order is revoked . . . the Commission shall
> consider whether the likely volume of imports of the subject
> merchandise would be significant if the order is revoked . . . either
> in absolute terms or relative to production or consumption in the
> United States. In doing so, the Commission shall consider all
> relevant economic factors, including—
>
> (A) any likely increase in production capacity or existing unused
> production capacity in the exporting country,
>
> (B) existing inventories of the subject merchandise, or likely
> increases in inventories,
>
> (C) the existence of barriers to the importation of such
> merchandise into countries other than the United States, and
>
> (D) the potential for product-shifting if production facilities in the
> foreign country, which can be used to produce the subject
> merchandise, are currently being used to produce other products.

19 U.S.C. § 1675a(a)(2)(A)–(D). In *Nippon III*, the court found that the ITC had not

demonstrated that it had considered these factors, nor had the ITC evaluated whether the likely

volume of imports would be significant either in absolute terms or relative to production or

consumption in the United States. Thus, the court instructed that on remand, "such consideration

must be reasonably discernible." *Nippon III*, 26 CIT at __, slip op. 02-153 at 14.

In its Remand Determination, the ITC concluded that "the likely volume of subject imports would be significant in terms of U.S. production and U.S. apparent consumption if the countervailing and antidumping duty orders were revoked." Remand Determination at 10–11. As to its consideration of the factors enumerated in 19 U.S.C. § 1675a(a)(2)(A)–(D), the ITC found, with respect to "any likely increase in production capacity or existing unused production capacity in the exporting country," 19 U.S.C. § 1675a(a)(2)(A), that the "subject producers indicate[d] that they have no plans to increase capacity within the foreseeable future . . . ." Remand Determination at 9. However, the ITC also found that "existing GOES production capacity in both [Japan and Italy] [was] substantial," and that "subject producers [had] appreciable unused capacity that could be used to produce subject merchandise for the U.S. market if the orders were revoked." *Id*. As to the factors enumerated in 19 U.S.C. § 1675a(a)(2)(B)–(D), the ITC found that the nature of the GOES industry prevented these factors from having much relevance. The ITC stated, "[T]he lack of inventories, absence of barriers to importation in other markets, and limited potential for product shifting, did not outweigh other factors which led [the ITC] to conclude that the likely volume of imports would be significant if the orders were revoked." *Id*. at 3. These other factors include: (1) the nature of supply and demand in the GOES industry, (2) the export orientation of the subject producers, (3) the range of GOES products offered by Japanese and Italian producers, (4) pricing practices in the United States and other countries during the original and the review periods of investigation (including the incentive of higher prices in the U.S. market as compared with other markets), and (5) patterns of shipments to other markets into which the subject imports are sold. *Id*. at 4.

Plaintiffs argue that the record does not support the ITC's conclusion that likely volume would be significant in terms of U.S. production and consumption.[32] To the contrary, Plaintiffs maintain that "the facts, information and data concerning each of [the four factors set out in 19 U.S.C. § 1675a(a)(2)] provide substantial evidence that the volume of subject imports likely would *not* be 'significant' . . . ." Pls.' Comments at 7 (emphasis in original); Pls.' Mem. at 23–25. In particular, Plaintiffs assert that: (1) "uncontested evidence shows that GOES producers in Japan and Italy have virtually no unused GOES production capacity and have no plans (and little ability) to add to their existing capacity," Pls.' Mem. at 23 (citation omitted); Pls.' Comments at 8 ("During the first nine months of 2000 – the most recent period for which data were collected – the subject producers did *not* have excess capacity that could be used to produce significant quantities of GOES for the U.S. market."(emphasis in original)); (2) "the record shows that subject GOES inventories are effectively non-existent (and thus do not provide Japanese and Italian producers with a means of making significant U.S. sales)," Pls.' Mem. at 23–24 (citations omitted); (3) "there are no trade barriers in other countries that would cause GOES shipments to be directed towards the United States," *id*. at 24 (citations omitted); and (4) "the specialty equipment used to manufacture GOES [i.e., box-annealing equipment and, in the

---

[32] The grounds on which Plaintiffs challenge the ITC's likely volume determination are substantially similar to those made with respect to the ITC's discernible adverse impact finding. Plaintiffs assert that the factors considered by the ITC and the evidence relied upon do not show that significant exports would be probable, but rather merely show that it is conceivable or possible to export "significant quantities of GOES to the United States in the future . . . ." Pls.' Comments at 15. While Plaintiffs concede that "it is true that there are no major logistical impediments to the shipment of GOES to the United States, . . . that the subject producers have significant export sales, and that their production capacity is large, these and other factors identified by the ITC show only that the subject producers have the physical *ability* to export GOES to the United States." *Id*. (emphasis in original). Plaintiffs' additional arguments are addressed below.

case of domain refined GOES, laser or mechanical scribing equipment,] precludes the subject producers from switching production away from other products in order to increase their U.S. GOES sales." *Id.* Plaintiffs complain that the ITC "gave almost no weight to this evidence." Pls.' Comments at 7.

Plaintiffs also take issue with the ITC's conclusion that the "purportedly higher prices made the U.S. market 'particularly attractive' and provided the subject producers with 'a primary incentive' to ship significant quantities of GOES to the United States." Pls.' Comments at 17 (citing Remand Determination at 6, 4). For example, Plaintiffs minimize the significance of the Japanese producers' sales of high permeability GOES in the United States [[

]] by noting that "only a tiny quantity of GOES [was sold] in the United States during the period of review," and "the record shows that those sales were made to U.S. customers that were willing to pay a premium for the Japanese product." *Id.* (citations omitted). Plaintiffs argue that the subject producers could not supply significant quantities of GOES to the United States without sacrificing sales to other customers because of high capacity utilization rates. *Id.* at 18.[33]

_____

[33] Plaintiffs cite evidence "relating to other economic factors that further illustrates why subject imports could not be significant," including: (1) "[e]vidence that orders from the subject producers' existing GOES customers in other countries will continue to grow rapidly due to strong world-wide GOES demand," (2) "[e]vidence that U.S. GOES demand has shifted significantly since the original[] (1994) investigation, such that domestic purchasers now predominantly favor a variety of GOES (conventional GOES) which the Japanese producers have never commercially exported to the United States," (3) "[e]vidence that U.S. GOES demand and production have been growing strongly, thus ensuring that subject imports into the United States would not be 'significant' in relative terms, even if they were to increase," and (4) "[e]vidence that GOES producers in Germany and France that are affiliated with AST have not exported

(continued...)

The ITC argues that it complied with the court's instructions in *Nippon III* by considering each of the statutory factors set forth in 19 U.S.C. § 1675a(a)(2), as well as other relevant economic factors. Def.'s Comments at 2–3. The ITC further argues that, given the nature of the GOES industry, it properly found that the lack of inventories, the absence of barriers to entry of the subject merchandise into third country markets, and the limited potential for the Japanese and Italian producers to product shift, were "not dispositive or indeed particularly meaningful." *Id*. at 4.

As to the finding that the Japanese and Italian GOES producers had "significant production capacity," the ITC argues that "that the aggregate capacity for both countries was [[                ]] of total U.S. consumption and U.S. production capacity of GOES for [1999]." Def.'s Comments at 5; *see* Conf. Remand Determination at 10–11. Moreover, although, as Plaintiffs point out, interim data from 2000 show high capacity utilization rates, i.e., [[      ]] for Japanese producers and [[           ]] for the Italian producer, the ITC claims it did not err in finding that "appreciable unused capacity" existed. Def.'s Comments at 6, 5. The ITC argues that "reported capacity utilization rates fluctuated over the period of review, and . . . that they will likely fluctuate for the foreseeable future." *Id*.; Remand Determination at 10 & n.56. With respect to other evidence that Plaintiffs argue shows that subject import volume would likely not be significant, i.e., that the demand for GOES among the subject producers' existing customers was projected to grow rapidly, the ITC contends that "the ITC did not ignore this

[33](...continued)
significant quantities of GOES to the United States, although they were not subject to antidumping or countervailing duty orders." Pls.' Mem. at 25–26 (citations omitted).

evidence but came to a different conclusion than did plaintiffs." Def.'s Comments at 7.

Specifically, the ITC found that shipments to other markets have been "erratic" and that GOES

sells at higher prices in the U.S. market than in other markets. *Id*. The ITC claims that this led to

its conclusion that "despite increased demand in subject producers' other export markets, the

U.S. market would be a far more attractive market for subject producers seeking the highest price

for their product." *Id*. In defense of its finding that GOES commands a higher price in the

United States than in third country markets, the ITC insists that "the record contains numerous

examples that subject producers' prices for the various grades of the subject product sold in

Canada and Mexico are below current domestic prices for competing grades." *Id*. at 11 (citing

Petitioners' Prehearing Br., List 2, Doc. 16, Ex. 1 at 64–66; Remand Determination at 6 n.24).

The court finds that the ITC has complied with the instruction in *Nippon III* to

"demonstrate . . . (a) that it . . . consider[ed] each of the four factors outlined in 19 U.S.C. §

1675a(a)(2)(A)–(D); and (b) that it considered whether, were the Subject Orders revoked, the

likely volume of imports of the subject merchandise would be significant either in absolute terms

or relative to production or consumption in the United States, pursuant to 19 U.S.C. §

1675a(a)(2)." *Nippon III*, 26 CIT at __, slip op. 02-153 at 16. It is evident in the Remand

Determination that the ITC considered the factors enumerated in 19 U.S.C. § 1675a(a)(2)(A)–(D)

and explained why it considered each factor relevant or not. *See* Remand Determination at 3 &

nn.22, 54, 55. Furthermore, the ITC considered the significance of likely volume if the Subject

Orders were revoked relative to U.S. production and consumption. *See, e.g.*, Conf. Remand

Determination at 10, 11 ("In 1999, the last full year for which data were available, the total

capacity for both countries was [[                                        ]] total U.S. consumption and U.S.

production of GOES for the same period." With respect to unused capacity, the ITC found that

"[i]n 1999, subject producers . . . had [[         ]] short tons of unused capacity, which was

equivalent to [[      ]] percent of U.S. production and [[      ]] percent of U.S. apparent

consumption for the same year.").


The court notes the following with respect to whether substantial evidence supports the

ITC's finding that GOES prices in the U.S. market are higher, and therefore would likely attract

imports. Affidavits submitted by petitioners reveal that the prices at which GOES was sold in

the United States are higher than the prices at which it was sold in third country markets. *See*

Petitioners' Prehearing Br., List 2, Doc. 16, Exs. 11 (Aff. of Robert D. Ross) & 12 (Aff. of

Robert I. Psyck). With respect to Japan, this evidence indicates that the purchase price for

Japanese GOES was lower than comparable products sold in third country markets. *See id*., Ex.

12 at 2 ([[



]]). With respect to Italy, the evidence supports a finding that Italian GOES was

purchased at a lower price in third country markets than in the U.S. market. *Id*., Ex. 11 at 1–2

("[T]he actual purchase price for AST's M-6 slit product delivered to [Canada] [was] at [[

]]. . . . The typical domestic price of Allegheny Ludlum's M-6 product is [[

]]. Allegheny Ludlum's cost to produce M-6 product is [[

]] Thus, AST is selling its M-6 product at a price [in Canada] that is [[

]] our cost to produce."). This evidence reasonably supports the conclusion that GOES commands a higher price in the U.S. market than in other markets.

However, in light of the questions to be addressed on remand with respect to likely discernible adverse impact and likely reasonable overlap of competition, the court remands the ITC's likely volume determination for further consideration. In particular, the ITC is instructed to revisit and explain in detail, with specific citations to the record, its determination that likely volume would be significant in light of the following evidence: (1) with respect to Japan: (a) high capacity utilization rates data reported for 2000,[34] (b) [[

]], (c) the evidence relating to whether the Japanese producers would likely export conventional GOES to the United States such that it would compete with Italian conventional GOES, and (d) whether it is likely that the Japanese producers' patterns of sale will change; and (2) with respect to Italy: (a) whether it is likely that AST will sell high permeability GOES to the United States such that it would compete with Japanese high permeability GOES, and (b) whether it is likely that the Italian producer's patterns of sale will change. The ITC shall also reconsider the above in light of the increase in U.S. demand and domestic production capacity, and strong worldwide demand for GOES, and explain whether these conditions of competition would prevent significant quantities of GOES

---

[34] As noted *supra*, the court cannot sustain the ITC's finding that because utilization rates have fluctuated in the past, they are likely to do so in the future, and that they will fluctuate to an extent that would allow exports to the United States that would be both discernible and adverse. On remand, the ITC shall explain which record evidence supports the finding that fluctuations in capacity utilization levels are likely, such that "appreciable" unused capacity exists, or will exist.

sales to the United States. Should the ITC decide not to cumulate the subject imports from Japan

and Italy, it shall amend its likely volume determination accordingly.

### B. *Likely Price Effects*

Title 19 U.S.C. § 1675a(a)(3) governs the ITC's determination with respect to likely price

effects:

> In evaluating the likely price effects of imports of the subject
> merchandise if the order is revoked . . ., the Commission shall
> consider whether—
>
> (A) there is likely to be significant price underselling by imports of
> the subject merchandise as compared to domestic like products,
> and
>
> (B) imports of the subject merchandise are likely to enter the
> United States at prices that otherwise would have a significant
> depressing or suppressing effect on the price of domestic like
> products.

19 U.S.C. § 1675a(a)(3)(A)–(B). According to the SAA, "in considering the likely price effects

of imports in the event of revocation . . ., the Commission may rely on circumstantial, as well as

direct, evidence of the adverse effects of unfairly traded imports on domestic prices." SAA at

886.

Here, the ITC concluded that "if the orders were revoked, significant volumes of subject

imports likely would significantly undersell the domestic like product to gain market share and

likely would have significant depressing or suppressing effects on the prices of the domestic like

product within a reasonably foreseeable time." Remand Determination at 15; Final

Determination at 18–19. The ITC noted several conditions of competition that it found relevant to its underselling and price depression/suppression findings. First, "the domestic like product and subject imports are substitutable." Remand Determination at 11. Second, "price is an important factor in purchasing decisions." *Id*. Third, "domestic prices have fallen during these reviews and are at lower levels than prices during the original investigations" as a result of "downstream competition from increased U.S. imports of both transformers and laminated/stamped GOES, declining average unit costs of U.S. GOES producers, and increased U.S. imports of GOES from non-subject countries compared with the original investigations." *Id*. at 12. The decrease in prices was notable because "it occurred at a time of increasing demand." *Id*.

Based on these conditions of competition and the pricing data available on the record, the ITC affirmatively determined that there would likely be significant price underselling, and price suppression, by imports of GOES, should the Subject Orders be revoked. The ITC noted that "several large purchasers have manufacturing facilities in both Canada and Mexico as well as the United States," and that these purchasers "are buying subject GOES from Italy and Japan for [these facilities] at prices that are lower than prevailing U.S. prices." Remand Determination at 12. Further, the ITC stated that these purchasers "are currently seeking to obtain prices from domestic producers [of] GOES for their U.S. facilities comparable to prices for the subject product shipped to their Canadian and/or Mexican operations." *Id*. at 12–13. Moreover, "heightened competition between domestic GOES purchasers and their competitors in Canada and Mexico" would cause U.S. customers to seek lower-priced subject imports if the Subject

Orders were revoked. *Id*. at 13. The ITC found that pressure on U.S. GOES producers to reduce prices, along with the "incentive for the low-priced, subject imports to return to the U.S. market since subject producers would receive a higher price for the product in the U.S. market relative to third country markets," would result in negative price effects from subject imports if the orders were revoked. *Id*.

Plaintiffs argue the record evidence does not support the ITC's price effects determination. First, with respect to the importance of price, Plaintiffs assert that questionnaire responses show that "availability, delivery time, product consistency, product quality, and reliable supply were actually *more frequently* identified as 'very important' purchasing factors for GOES than was price." Pls.' Comments at 20 (emphasis in original). Second, with respect to the "expectations of several responding importers and purchasers," Remand Determination at 12, Plaintiffs argue that "a close review of [the purchaser questionnaire responses with respect to Japanese GOES cited by the ITC] shows that these [responses] are generally directed at competition in product quality and availability with respect to high-permeability GOES, and not at narrow price competition." Pls.' Comments at 20; *see also id*. at 21 (examining particular questionnaire responses with respect to AST and arguing that these responses indicate that "revocation would have little or no effect"). Third, with respect to the pressure being exerted on U.S. producers to reduce their GOES prices so as to compete with lower-priced imports, Plaintiffs contends that the record is devoid of any evidence "that [large manufacturers with facilities in the United States, Canada, and Mexico] are aggressively pressuring their U.S. suppliers to reduce their prices to supposedly lower levels prevailing in Canada or Mexico." *Id*.

at 21–22. Plaintiffs also take issue with the evidence cited by the ITC to show that "prevailing U.S. GOES prices were higher than those charged by the subject producers in Canada or Mexico." *Id.* at 22. In particular, Plaintiffs challenge the propriety of the ITC's use of average unit values of GOES imports temporarily brought into the United States for subsequent export to Canada and Mexico (so called "temporary importation under bond," or "TIB," entries) as evidence of likely underselling.[35]

Finally, Plaintiffs fault the ITC for allegedly "not addressing record evidence that weighs against its finding of 'likely' significant adverse price effects." Pls.' Comments at 23. Specifically, Plaintiffs argue the ITC did not consider: (1) evidence that "domestic producers are shielded from import competition through their fixed-price contracts and long-term

---

[35]      Specifically, the ITC found the following:

> Average unit values for U.S. imports of GOES from Japan under temporary importation under bond . . . provisions in 1999 of $0.49 per pound, were substantially lower than the AUV of $0.97 per pound for imports for consumption. Similarly, data for U.S. imports from Italy show the AUVs of TIB imports were $0.43 per pound in 1999, while the AUVs for imports for consumption were at $0.59 per pound.

Remand Determination at 12 n.67. Plaintiffs argue that *Allegheny Ludlum Corp. v. United States*, 24 CIT 858, 879, 116 F. Supp. 2d 1276, 1297 (2000), *aff'd in part and rev'd on other grounds*, 287 F.3d 1365 (Fed. Cir. 2002) supports the position that "'substantial evidence does not support the ITC's use of {AUVs} as specific evidence of price underselling,' particularly where the product mix between two markets differ." Pls.' Comments at 22 (quoting *Allegheny Ludlum Corp.*, 24 CIT at 879, 116 F. Supp. 2d at 1297) (bracketing as it appears in Plaintiffs' brief). Plaintiffs contend that here the TIB entries were "less-expensive, semi-finished products," whereas the products imported for consumption in the United States were "primarily . . . finished products sold directly for use by end-users for which [the subject producers] could achieve a price premium." *Id.* at 22–23 (citations omitted).

relationships"; and (2) evidence which Plaintiffs argue shows that "any effect subject imports may have on U.S. prices is *already* being felt." *Id.* at 24 (emphasis in original).  With respect to the latter evidence, Plaintiffs highlight the increased levels of U.S. imports of finished transformers and that "GOES from Japan and Italy is currently available from laminator[s]/stampers in Canada and Mexico, who are able to ship stamped GOES to the United States without having to pay dumping duties." *Id.* at 25 (citations omitted).

The ITC characterizes Plaintiffs' arguments with respect to the ITC's likely price effects determination as "merely improper attempts to have the Court reweigh the evidence."  Def.'s Comments at 12.  First, with respect to Plaintiffs' argument that the ITC exaggerated the importance of price, the ITC argues that "price need not be the most important factor in purchasing decisions to be an important factor in purchasing decisions." *Id.* (citing *Acciai Speciali, S.p.A. v. United States*, 19 CIT 1051, 1059 (1995)).  Second, the ITC argues that the questionnaire responses it cited in the Remand Determination indicate "that customers expect the return of lower-priced subject imports following revocation . . . ." *Id.* at 12–13.  Third, the ITC argues that "there are numerous examples that prices in Canada and/or Mexico are lower than U.S. prices . . . and the evidence cited . . . is replete with examples of price pressure exerted on domestic producers." *Id.* (citing ABB's Posthearing Br., List 1, Doc. 59, List 2, Doc. 28 at A-1; Petitioners' Posthearing Br., List 2, Doc. 27, Ex. 1 at 61–68).  Finally, with respect to the relevance of fixed-price contracts in the U.S. market, the ITC found that "the majority are short term contracts (less than a year in duration) and likely would afford little protection to domestic producers from low-priced imports." *Id.* at 13–14 (citations omitted).  As for Plaintiffs'

contention that the price effects of the imports are already being felt, the ITC argues that this proposition "rests on the fact that low-priced imports are available to those transformer manufacturers operating outside the United States," and Plaintiffs' argument "ignores the direct price effect that would likely result if those same subject imports return to the U.S. market once the orders are lifted." *Id*. at 14.

After having reviewed these arguments, and in light of the court's decision that remand is appropriate in order to afford the ITC the opportunity to revisit, and, if necessary, revise, its likely volume determination, the court concludes that its likely price effects determination should be remanded as well. This is because it is clear from the Remand Determination that the ITC's finding that likely volume would be significant affected the ITC's price effects determination. *See* Remand Determination at 13–14 ("[I]f the orders were revoked, significant volumes of subject imports likely would significantly undersell the domestic like product to gain market share and likely would have significant depressing or suppressing effects on the prices of the domestic like product within a reasonably foreseeable time."). The court notes the following, however, with respect to substantial evidence.

First, with respect to substitutability, the evidence demonstrates that the domestic like product and subject imports of GOES from Japan and Italy are substitutable. According to questionnaire responses, "quality, price, and availability, in descending order of importance, were considered to be the top three purchase factors." Staff Report at II-34. With respect to these purchase factors, the U.S. product, Italian (M-6 grade) GOES, and Japanese high permeability

products were rated comparably. *See id.*, tbl. II-2. U.S. GOES was rated superior to Japanese

GOES in the categories of availability and lowest price. *Id.* It was rated superior to Italian

GOES in the categories of delivery time and reliable supply. *Id.* According to the Staff Report,

the ease with which purchasers switch from the U.S. product to subject imports, or vice versa,

when prices change, "largely depends upon the degree to which there is an overlap of

competition between U.S.-produced and imported GOES, and product differentiation." *Id.* at II-

41 & n.93. In light of the GOES purchasers' questionnaire responses and the ITC's undisputed

finding that there likely would be an overlap of competition between the domestic like product

and Japanese GOES, and between the domestic like product and Italian GOES, the court finds

substantial evidence supports the ITC's substitutability finding.

Second, the court finds that substantial evidence supports the ITC's finding that price is

an important factor in purchasing decisions. As discussed above, price was reported to be one of

the top three factors taken into consideration by purchasers. Ten out of fourteen questionnaire

responses ranked price as "very important," and the remaining four ranked price as "somewhat

important." Staff Report, tbl. II-1. The court finds this evidence is such that a reasonable mind

might accept as adequate to support the ITC's finding that price was an important factor in

purchasing decisions.

Third, with respect to the expectations of several responding importers and purchasers as

to the effects of revocation, the court finds that the questionnaire responses cited by the ITC are

varied, but generally support the proposition that greater competition in the U.S. GOES market

would likely result.  *See* Staff Report at II-43, D-5–D-20; *see, e.g.*, [[                                    ]]

Purchaser Questionnaire Resp., Ques. IV-1, *reprinted in* Staff Report at D-13 (with respect to

Italy) ("[[

]]); [[

]] Purchaser Questionnaire Resp., Ques. IV-1, *reprinted in* Staff Report at D-18 (with

respect to Japan) ([[

]]).  The court finds this evidence generally supports the ITC's finding that there would be

heightened price competition if the Subject Orders were revoked.

Fourth, with respect to the ITC's use of the average unit values of TIB entries as

indicators of the "aggressive low prices at which the unfairly traded imports likely would be sold

in the U.S. market if the orders were revoked," Remand Determination at 12 n.67, the court finds

further explanation is required.  The TIB entries are "'not-for-consumption' imports [that] are

either slit to a narrower width in the United States and then shipped to Canada or Mexico or . . .

simply shipped through the United States to Canada or Mexico."  Staff Report at IV-2.  Japan

reportedly exported "semi-finished GOES products, for which some kind of further processing

[was] required" to laminators/slitters in Mexico and Canada in 1999, the year for which the ITC

examined AUV data.  Japanese Producers' Posthearing Br., List 1, Doc. 58, List 2, Doc. 26 at

App. A. That same year, Japan exported only "highly specialized GOES products to a very limited number of purchasers in the United States." *Id*. AST reportedly sold unfinished GOES products to Canada and Mexico. *See* AST's Posthearing Br., List 2, Doc. 29 at A-2. It has been held that the use of AUVs "may be reliable indicators of general price trends, provided the 'product mix ' comprising an AUV does not significantly change over time." *Allegheny Ludlum*, 24 CIT at 880, 116 F. Supp. 2d at 1297 (discussing *United States Steel Group v. United States*, 96 F.3d 1352, 1364 (Fed. Cir. 1996)). This holding is designed to ensure an accurate, "apples to apples" assessment of price comparisons in making a price underselling determination. *Id*. In this case, remand is appropriate on the issue of whether the use of AUVs as an indicator of price underselling produced an accurate comparison of price differences, given the questions that exist with respect to whether the grade of GOES likely to be exported to the United States from Japan and that from Italy are fungible. *Cf. Indorama Chems. (Thail.)*, 26 CIT at __, slip op. 02-105 at 15 ("The Commission reasonably relied upon average unit value . . . data for the domestic and Thai product, explaining that average unit value data provide a reliable basis for price comparisons because [the subject merchandise] is a fungible commodity product sold in a single grade.").

Fifth, with respect to Plaintiffs' argument that the "domestic producers are shielded from import competition through their fixed-price contracts and long-term relationships," Pls.' Comments at 24, the court finds that the ITC considered the record evidence of short- and long-term contracts and nonetheless found that heightened price competition was likely. *See* Final Determination at 19 ("[A]lthough domestic sales are generally made through short- and long-

term contracts, the contracts will afford little protection to the domestic producers as contract

terms are often re-negotiated during the life of the contract.") (citing, *inter alia*, Staff Report at

V-6). The evidence as summarized in the Staff Report indeed supports the finding that contract

price may be re-negotiated based on a number of different circumstances that may arise during

the life of the contract. Staff Report at V-6. Plaintiffs have merely urged a different

interpretation of the evidence. Similarly, Plaintiffs' argument that the domestic industry is

already experiencing the price effects subject imports would likely have if the Subject Orders

were lifted proposes a different interpretation of the evidence, but does not convince the court

that the ITC committed any error in its finding. It is true that the evidence indicates an increase

in imports of finished transformers from Canada and Mexico, which may have been made with

Japanese and Italian GOES imported by transformer producers in those countries. The ITC

discussed that evidence in the context of its finding that the U.S. GOES purchasers with facilities

in the United States, Canada, and Mexico would likely pressure U.S. GOES producers to lower

their prices in order to compete with the prices at which Japanese and Italian GOES could be

purchased in Canada and Mexico. Conf. Remand Determination at 7 n.31. A review of the U.S.

customers' questionnaire responses cited by the ITC reveals such evidence reasonably supports

this conclusion. *See, e.g.*, [[                                   ]] Importers Questionnaire Resp., Ques. II-4a & b,

*reprinted in* Staff Report at App. D-6 ([[

                                                                                      ]]). While it is possible to interpret

the evidence of increased imports of transformers made with Japanese or Italian GOES as

indicating that any impact the subject imports might have on the domestic industry is already

being felt, the possibility of drawing two inconsistent conclusions from the record evidence does

not, in itself, prevent the ITC's determinations from being supported by substantial evidence.

*Consolo*, 383 U.S. at 620. As the evidence supports the conclusions and inferences drawn by the

ITC from such evidence, the court finds the ITC committed no error on this issue.

On remand, the ITC shall reexamine whether the use of AUVs as an indicator of price

underselling produced an accurate comparison of price differences. In reaching its

determination, the ITC shall explain the differences and similarities between the products

imported temporarily for re-exportation to Canada or Mexico and those imported for

consumption in the United States, and support such determination with record evidence. To the

extent that, on remand, the ITC revises any of the findings it made in the Remand Determination,

*inter alia*, those with respect to cumulation and likely volume, the ITC shall amend its likely

price effects determination accordingly.

## C.    *Likely Impact*

The ITC is instructed by statute to consider the likely impact of imports of subject

merchandise on the domestic industry if the orders were revoked. 19 U.S.C. § 1675a(a)(1).

Pursuant to 19 U.S.C. § 1675a(a)(4), the ITC "shall consider all relevant economic factors which

are likely to have a bearing on the state of the industry in the United States, including, but not

limited to"

> (A) likely declines in output, sales, market share, profits,
> productivity, return on investments, and utilization of capacity,

> (B) likely negative effects on cash flow, inventories, employment,
> wages, growth, ability to raise capital, and investment, and

> (C) likely negative effects on the existing development and
> production efforts of the industry, including efforts to develop a
> derivative or more advanced version of the domestic like product.
>
> The Commission shall evaluate all relevant economic factors
> described in this paragraph within the context of the business cycle
> and the conditions of competition that are distinctive to the
> affected industry.

*Id*. In accordance with 19 U.S.C. § 1675a(a)(1), the ITC is instructed to consider the effect of the

Subject Orders, including whether improvement in the state of the domestic industry is linked to

the imposition of the orders and the vulnerability of the domestic industry in the event the orders

were revoked. *See* SAA at 885.

The ITC concluded that "if the countervailing and antidumping duty orders were revoked,

subject imports from Italy and Japan would be likely to have a significant adverse impact on the

domestic industry within a reasonably foreseeable time." Remand Determination at 16–17. The

ITC concluded this after considering its original affirmative material injury determination and the

effect of the Subject Orders on the state of the industry. *Id*. at 15. The ITC found that after

imposition of the orders "the domestic industry's performance improved significantly." *Id*. The

ITC further determined that "the domestic industry has returned to a relatively healthy state and

is not currently in a vulnerable condition as contemplated by the statute's vulnerability criterion."

*Id*. at 15–16. In light of its findings with respect to likely volume and price effects, however, the

ITC concluded that a "significant negative impact" on the domestic industry would result and

"would likely cause the domestic industry to lose market share." *Id*. at 16 (noting also that "the

loss in market share and subsequent decrease in capacity utilization would be more severe in this

capital intensive industry, in light of the need to maintain high capacity utilization to recoup

investment."). Moreover, the ITC found:

> [I]t [is] likely that the effect of revocation on domestic prices,
> production, and sales would be significant. The price and volume
> declines would likely have a significant adverse impact on the
> production, shipment, sales, and revenue levels of the domestic
> industry. This reduction in the industry's production, sales, and
> revenue levels would have a direct adverse impact on the
> industry's profitability as well as its ability to raise capital and
> make and maintain necessary capital investments. In addition, we
> find it likely that revocation of the orders will result in employment
> declines for domestic firms.

*Id*. at 16. Thus, the ITC made an affirmative determination of likely significant adverse impact if

the Subject Orders were revoked.

Plaintiffs assert that the ITC's impact determination "rests entirely upon the 'significant'

volume and price effects that it found 'likely,'" and that because those determinations cannot

withstand judicial scrutiny, the impact determination must also fail. Pls.' Comments at 25.

Plaintiffs further claim that the ITC's finding that the domestic industry was not vulnerable to

material injury is irreconcilable with its likely adverse impact determination. *Id*. at 25–26.

While Plaintiffs do not argue that a finding of non-vulnerability necessarily precludes a finding

of likely material injury, Plaintiffs' view is that "[a] finding that an industry is not even

'susceptible' to material injury 'by reason of dumped or subsidized imports' seemingly makes it

highly *un*-likely that subject imports would 'likely' cause material injury to that same industry

within a reasonably foreseeable time, absent extraordinary circumstances." *Id*. at 26 (emphasis in

original).

The ITC takes issue with Plaintiffs' argument that it cannot reconcile its finding that the domestic industry is not vulnerable under 19 U.S.C. § 1675a(a)(1)(C), with its finding that revocation of the Subject Orders would be likely to lead to material injury. The ITC claims that "[t]his argument is meritless since the statutory scheme itself reconciles the two." Def.'s Mem. at 44. According to the ITC,

> a vulnerability finding relates to whether the domestic industry is in a weakened state as a result of economic factors *other than* subject imports and thus susceptible to injury as a result. The SAA further explains that if the industry is in a weakened state, [the ITC] should consider whether it will deteriorate further as a result of subject imports. Whether or not an industry is in a weakened state, the Commission musts still determine whether that industry would likely be harmed by subject imports if the order is revoked. Consequently, a finding of no vulnerability does not preclude a finding of likely recurrence of material injury . . . .

*Id*. (emphasis in original) (citing SAA at 885). Thus, the ITC urges the court to sustain the likely impact determination.

The court notes the following with respect to the ITC's finding that "the domestic industry has returned to a relatively healthy state and is not currently in a vulnerable condition as contemplated by [19 U.S.C. § 1675a(1)(C)]." Remand Determination at 15–16. In accordance with 19 U.S.C. § 1675a(a)(1)(B), (C), and relevant provisions of the SAA,[36] the ITC properly

---

[36]    According to the SAA, "[t]he term 'vulnerable' relates to susceptibility to material injury by reason of dumped or subsidized imports. This concept is derived from existing standards for material injury and threat of material injury." SAA at 885 (quoting H.R. REP. NO. 317, 96th Cong., 1st Sess. 47 (1979); H.R. CONF. REP. NO. 1156, 98th Cong., 2d Sess. 174, 175 (1984)). The SAA further provides:

> In material injury determinations, the Commission considers, in

(continued...)

considered "whether there has been any improvement in the state of the domestic industry that is

related to the imposition of the order[s] . . .," SAA at 884, and whether the domestic industry was

currently in a vulnerable condition.[37]  The ITC determined that these facts indicated that the

---

[36](...continued)
> addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.  In threat determinations, the Commission must carefully assess current trends and competitive conditions in the marketplace to determine the probable future impact of imports on the domestic industry and whether the industry is vulnerable to future harm.

> If the Commission finds that an industry is vulnerable to injury from subject imports, it may determine that injury is likely to continue or recur, even if other causes, as well as future imports, are likely to contribute to future injury.  If the Commission finds that the industry is in a weakened state, it should consider whether the industry will deteriorate further upon revocation of an order . . . .  It also should consider whether such a weakened state is due to the possible ineffectiveness of the order . . . or its circumvention.

SAA at 885.

[37]     Specifically, the ITC found that

> [f]ollowing imposition of the orders, the domestic industry's performance improved significantly.  The domestic industry had a [[          ]] operating margin of [[     ]] percent in 1993.  By 1997, just three years after the imposition of the orders, with a dramatic decrease in subject imports in the U.S. market, the domestic industry had a [[          ]] operating margin of [[    ]] percent.  Other indicators also improved.  Since 1994, the industry has both modernized existing capacity and added needed additional capacity.

Conf. Remand Determination at 16–17.

domestic industry had returned to a healthy state and was not in a vulnerable condition. Remand Determination at 15. That is, it found that the domestic industry was not susceptible "to material injury by reason of dumped or subsidized imports." SAA at 885. While a finding that the domestic industry is not vulnerable may not preclude a finding that material injury is likely to continue or recur, "[a] robust industry, as indicated by such factors as increasing production, increasing capacity utilization rates, increasing shipments and strong profits is less likely to become materially injured in the near future than an industry characterized by declining production and negative profit margins." *Calabrian Corp.*, 16 CIT at 354, 794 F. Supp. at 388 ("A strong indication of the likelihood of material injury to an industry in the near future is its present state."). Here, the ITC found that the domestic industry had added new capacity, modernized existing capacity, and increased production and capacity utilization rates. Final Determination at 20; *id*. at 17 n.81 (finding that although "the domestic industry will have sufficient capacity to supply [the anticipated] modest increase in demand [for GOES]," due to the "significant investments [by domestic producers] both to add capacity and to improve existing capacity," "lower-priced subject imports would still have negative price effects on the domestic industry as the domestic industry would be forced to lower prices in order to compete with subject imports."). In light of these improvements, it is difficult to see how production, sales, revenue levels, profitability, ability to raise capital, investments, and employment[38] would likely,

---

[38]     The ITC states that it made its impact determination by taking into consideration the business cycle and relevant conditions of competition, and thus complied with 19 U.S.C. § 1675a(a)(4) in this respect. *See* Remand Determination at 14. The ITC also claims it considered the effect revocation of the Subject Orders would have on the domestic industry in the context of the factors enumerated in 19 U.S.C. § 1675a(a)(4), i.e., production, sales, revenue levels, profitability, ability to raise capital, investments, and employment. However, the ITC does not

(continued...)

i.e., probably, experience a "significant adverse impact." This is particularly the case since the ITC has concluded that such impact was likely without identifying specific record evidence in support of its findings with respect to these factors.

On remand, the ITC shall address these deficiencies and: (1) explain how, if at all, any revisions to the ITC's likely volume and likely price effects determinations alter its impact finding, (2) explain, in detail, the extent to which future imports factored into its no vulnerability finding, and (3) identify specific record evidence supporting its findings with respect to production, sales, revenue levels, profitability, ability to raise capital, investments, and employment.

## CONCLUSION

It is apparent that, in light of the court's ruling with respect to the meaning of likely, the ITC's efforts to satisfy its substantial evidence obligations by merely referencing the Final Determination have not succeeded. On remand, the ITC shall revisit the evidence cited for its findings with respect to cumulation and likelihood of continuation or recurrence of material injury and satisfy its obligations with specific reference to the evidence it claims supports its conclusions and adequate explanations of its findings based on this evidence. The ITC shall also address the record evidence which "fairly detracts" from the weight of the evidence supporting

---

[38](...continued)
cite any record evidence pertaining to these factors. *Id*. at 16. It appears that the ITC relied exclusively on its determinations with respect to likely volume and price effects without citing specific evidence relating to the above factors, which it found would likely suffer a "significant adverse impact." *Id*.; Final Determination at 20.

the ITC's determinations.  Remand results are due within ninety days of the date of this opinion,

comments are due thirty days thereafter, and replies to such comments eleven days from their

filing.

                                                            _____/s/ Richard K. Eaton_____

Dated:  December 17, 2003
          New York, New York